The Chancellor.
John Lake, administrator of John Butler, deceased, sued Garret Roach and John McCauley, executors, &c. of John Powers, deceased, in the court of common pleas of the county of Warren, upon a sealed bill, purporting to have been made by the testator, and dated June twenty-fourth, eighteen hundred and thirty-seven, for one thousand five hundred dollars, payable to John Butler, his executor, administrator or assigns, six months after date, with interest.
To this suit the executors of Powers uleaded non estfactwm. and duress g>er mino,s.
At the term of February, eighteen hundred and forty, the cause was tried and a verdict rendered. Judgment nisi entered in favor of the plaintiffs, for the amount of principal and interest due on the sealed bill.
A rule to show case why the verdict should not be set aside and a new trial granted, was taken, but after argument, was vacated, at the term of August, eighteen hundred and forty. An action was then brought in the Warren circuit court, aga'nst Roach and McCauley, upon the judgment, suggesting a devastmit.
*468 The executors, defendants at law, have filed their bill in this court to restrain the administrator of Butler from proceeding any further upon the said judgment, or in the action brought upon it, and from any other proceeding at law toüching the said matter.
The bill of complaint charges that the sealed bill was obtained fraudulently and without any consideration, and when the said John Powers was intoxicated, and not capable of knowing what he did; and that a certain deed of conveyance of a farm, from Powers to Butler, was also obtained fraudulently, and without any consideration, when Powers was intoxicated and incapable of transacting business or of disposing of his property, and by threats of personal violence, and through fears of bodily harm; and that Butler had extorted money from Powers, by threats of violence, and had purloined his books of account containing charges against himself, and divers papers, including several promissory notes. And it is further alleged that at the time of the trial, the complainants were wholly ignorant of the matters so charged, and have since discovered new and material evidence respecting the same. And the prayer is for relief against the judgment, or any proceeding thereon ; and for an account of the notes purloined, money advanced, &c. The cause is now on final hearing, upon the bill, answer, replication and proofs, the amount of the judgment having been deposited here.
The first question is, whether this court should interfere in this case and restrain the party from enforcing his judgment at law?
New trials were granted by courts of law at a very early date, as early, at least, as the year sixteen hundred and fifty-five, and even before that time, as appears from Slade’s case, Style, 138, and by a remark of Glynn, chief justice, in Wood v. Gunston, Style, 446; although no report is found further back, as the old books do not contain reports of the determinations made by the court upon motions: Bright, Ex'r, v. Eynon, 1 Burr. 394.
But for a longtime the rules for granting new trials were held *469 ■with a strictness so intolerable, that parties were driven into a court of equity, to have, in effect, a new trial at law upon a mere legal question, because the verdict, under all circumstances, ought not to conclude : Ibid, 394, 5.
Subsequently, these rules rave been relaxed, until the jurisdiction has become well established, and is frequently exercised at law, upon equitable as well as legal grounds ; so that in almost every case where the court are satisfied that there are strong probable grounds to suppose that the merits have not been fairly and fully discussed, and that the decision is not agreeable to the justice and truth of the case, they will grant a new trial: 3 Black Com. 392; 6 T. R. 638; 2 Arch. Pr. 222 Hutchinson v. Coleman, 5 Hals. 74.
Upon an examination of the numerous authorities, most of which have been referred to by the counsel in this cause.it will be seen, that as the courts of law have extended their jurisdiction over this subject, the courts of equity have withdrawn their jurisdiction from it. And this is in accordance with the general principle, that where a court of law can furnish an adequate remedy, a court of equity will not interfere.
Hence it has became the settled doctrine of the English, chancery, not to relieve against a judgment at law on the ground of its being contrary to equity, unless the party agrieved was ignorant of the fact in question pending the suit, or it could not have been received as a defence : Williams v. Lee, 3 Atkyns, 223.
In Bateman v. Willoe, 1 Sch. and Lef. 201, lord Eedesdale said, “There are cases cognizable at law, and also in equity, and of which cognizance cannot be effectually taken at law, and therefore equity does sometimes interfere; so where a verdict has been obtained by fraud, or where a party has possessed himself improperly of something by means of which he has an unconscientious advantage at law, which equity will either put ■out of the way or restrain him from using; but without circumstances of that kind I do not know that equity ever does interfere to grant a new trial of a matter which has already been *470 discussed there, and over which the courts of law can have full, jurisdiction. ”
The same learned jurist adds, “ It is not sufficient to show that injustice has been done, but that it has been done under circumstances which authorize this court to interfere; because, if a matter has already been investigated in a court of justice-according to the common and ordinary rules of investigation, a court of equity cannot take upon itself to enter into it again.”'
This doctrine has been fully recognized in the Hnited States. In the Marine Insurance Co. v. Hodgson, 7 Cranch, 336, chief justice Marshall said, "Without attempting to- draw any precise line to which courts of equity will advance and which they cannot pass, in restraining parties from availing themselves of judgments obtained at law, it may safely be said, that any fact which clearly proves it to be against conscience to execute-a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have-, availed himself at law but was prevented by fraud or accident,, unmixed with any fraud or negligence in himself or his agent,, will justify an application to a court of chancery.
In Lansing v. Eddy, 1 John. Chan. R. 51, chancellor Kent adopted the same rule. And in Simpson v. Hart, Ibid 98, 9, he reiterates it more at length, and cites 1 Johns. Cases, 436; 6 T. R. 471; and 1 Sch. and Lef. 201.
The decree in Simson v. Hart was reversed in the court of errors, (see 14 John R. 77,) but Spencer, chief justice, who-delivered the opinion of the majority of the court, approved of the principles cited by chancellor Kent, but denied their applicability to that case. See also Duncan v. Lyon, 3 John. C. R. 356, 7; Foster v. Wood, 6 John. C. R. 90; Floyd v. Jayne, Ibid, 482; Norton v. Woods, 5 Paige, 249; Winthrop et al. v. Loubat, 3 Dess. 324, 5; Noland v. Cromwell, 4 Munf. 155; and as to the diligence required; see Glover v. Hedges, Saxton, 119.
These principles, in my judgment, are in accordance with equity and sound sense, and should govern this case.
*471 If, therefore, it shall appear that facts exist which render it inequitable in the plaintiff at law to enforce his judgment, and that those facts could not avail the defendants, either by reason of the rigid rules of law, or by fraud or accident, or by reason of their being unknown to them in time for that purpose, without any fraud or negligence on their part, then the plaintiff must be restrained, otherwise not.
If the sealed bill were obtained by fraud and imposition, the judgment upon it cannot in conscience be enforced.
Now if it were procured by threats of personal violence and injury, or under the influence of extreme terror, or of apprehension, although short of duress. In such case, the party is not a free agent, and the instrument is not his deed. lie is said to stand in vineulis . And the rule of equity is, where a party is not a free agent, and is not equal to protecting himself, the court will protect him: 2 Story’s Eq. (3d edition,) 239, and cases cited in note 2.
But if the evidence of the fraud, or threats of violence, or undue influence were known, or with due diligence might have been known to the party defendants in time to bo used by law, and were such as the court ought to have taken notice of, then this court cannot interfere, even if the judgment is against conscience. In such case the party must seek redress, if he is entitled to any, in a court of appellate jurisdiction.
Let us examine the facts of the case, and inquire, first, whether the judgment is againt conscience; and if so, then whether it is a case in which this court should interfere.
James McTier, the scrivener and subscribing witness to the sealed bill, testifies, that the old man (Powers) had spoken to him before about making a bond to Butler for one thousand dollars, but that at the time it was drawn he directed it to be made for fifteen hundred dollars; that lie saw him make his mark to it, and that he, McTier, subscribed his name as a witness to it. He does not remember of reading it over to him, nor of the old man’s putting his hand upon the seal; but, being accustomed to transact such business, and to read over such *472 instruments, before tbeir execution, he thinks he read this over to Powers; and seeing the seal to it, he presumes that Powers must have acknowledged it to be his hand and seal for the purposes therein mentioned. That the old man made his mark instead of signing his name, because of the defect of his eyesight ; and that he said he could not see through any glasses he had ever seen. And he thinks the bond was delivered to Butler or his wife. That the old man at the time seemed rational and willing that the writings should be made, although he was too old to look over them.
This is the evidence of the instrumental witness, and upon it the jury had a right to find the due execution of the bond.
Unless something further can be shown, the judgment cannot be considered as against conscience.
Upon further examination, it appears that the deed was drawn and executed on the same day with the bond, but not on the day it bears date.
He says the deed was read over to Powers before the execution, and that he made his mark to it and acknowledged it to be his hand and seal, and that he (McTier) and Thomas Butler signed their names as witnesses to it.
The subject of the execution of the deed is introduced into the complainant’s bill, not for the purpose of setting aside the deed, for that will devolve upon the heirs or creditors of Powers, but to enable the complainants to resort to other testimony respecting it, and thereby more fully to develope the alleged fraud in procuring the bond.
With this rule, Abraham Stiers, one of subscribing witnesses to the deed is called, and he says that he was at Butler’s, where Powers then lived, the day before the deed was executed; that something was said about signing the deed, and Powers said he would not sign it till he got some papers which Butler had of his. He thought the old man not calculated to do business altogether correct; but could not say he was or was not. He thought him incapacitated by drinking and old age, and had understood he had been drinking “ a spell back, pretty hard,” *473 but was sober at that time, for anything he knew ; that Butler ■spoke to him middling sharp, and he thought he showed some fear of Butler, but that Butler spoke to him more sharply on that day than on the day the deed was executed. He says he was there the next day in the morning, but not on the day the deed bore date, that Lake was there also, and read over the deed to Powers, and Powers said it was right, and that he then made his mark to it, and Lake and he witnessed it.
On the day before the execution of the deed, Ziba Osman was present at the time Stiers speaks of, and before Stiers came; he says he was sent for, and Powers told him he wanted to see him, that he wTas going to make a deed to Butler for that place; that Butler had his papers, and if he would not give them up? he would never sign the deed; and added, “If he misses this chance, he may never have the opportunity again; I am an old man, with one foot in the grave and the other trembling over it, and I may perhaps die before to-morrow morning.” He says Butler was drunk, and used harsh language to Powers, .and told him to “shut up his shell.” That Powers was sober ^ and so far from being terrified by Butler’s language; he said he was a saucy impudent puppy, and rather made a little threat with his cane if he did not hold his tongue.
This is the language and conduct of a sober rational man, and if true, shows that Powers contemplated the execution of the deed, but had a,good reason for not doing so.
Mrs. Butler then went up stairs and brought down some pa. pers, among which were two deeds, one from Lake to Powers, and the other the deed he was going to give to Butler, two old wills and other papers that the witness did not particularly notice. The deed to Butler was read over by Osman, and Powers ■appeared satisfied ; and it would seem that Powers was then willing to sign the deed, but Osman recommended him to wait till next morning. He did so, and on the next morning the deed was executed, as before stated. Other conversations be. tween the witness and Powers at this time, show intelligence and memory, and a sound disposing mind.
*474 This witness says that McTier’s name was not subscribed to the deed at the time he read it to Powers; he is sure of it, and he thinks Butler’s name was not there. That he understood from some of the family, that McTier went down the same evening and witnessed them.
If this satement is correct, it goes far to disturb our confidence in McTier, and throws suspicion over his whole conduct. But it will not do to condemn a witness upon the declarations of third persons, and they perhajss interested to make them; and then it becomes a question who is right about the signatures of the subscribing witnesses, McTier or Osman ? McTier being the scrivener, accustomed to the transaction of business of this kind, is more likely to have recollected so important a fact as the signing his name as a witness, than Osman to recollect whether it was signed to a paper, which he was merely called upon to-read, without having his attention called particularly to that part of it; at least it is safe to say that his testimony upon this-point is not overcome by that of Osman.
Nor do I conceive it to be disturbed by the transactions at the time of executing the deed, and the day- previously as narrated by Stiers, and more fully detailed and explained by Osman,,
But there are irregularities apparent upon the face of the papers, incongruities in the statement of McTier in relation to them, and which are urged as bearing strong evidence of fraud. He says the deed and bond were drawn and executed on the same day, yet they bear different dates, and the deed executed twice, and was proved before a judge on a day prior to the date of the bond. A blank seems to have been left in the bond for the sum to be secured, although the obligor sat by when it was drawn. There are several erasures in the deed, which under some circumstances would be very natural. Of these and some other similiar irregularities, the witness can give no explana, tion, although an explanation is so very desirable, and would perhaps go so far to sustain his testimony.
But it must be remembered that a period of three and a half years elapsed between the execution of the instruments, and *475 giving the testimony; and it is not surprising that many of thr particulars of the transaction should have been forgotten.. Many things are done, too, contrary to the usual course of business, either through the want of skill in the agent, or to satisfy the caprice of the principal. Yet if they are not inconsistent with fair dealing, we cannot regard them as fatal.
Some attempt lias been made to impeach the witness, on the ground of intemperance; but whatever may have been his habits, there is no proof of intoxication at the time of drawing-these papers. Indeed the penmanship itself raises a pretty fair presumption to the contrary.
The statements made by him to Mrs. Henderson in eighteen hundred and thirty-nine, that Powers would hold up his hand and say, “Look at those little gnats and wafers flying about, &c.” may all have been true, and yet they do not impeach the credit of the witness nor the capacity of the grantor. Dr. Gale-tells us that in eighteen hundred and thirty-five, the old man’s eyesight was defective, so that when he looked at objects suddenly, at a distance, they did not appear right to him; there, was an illusion and errors in vision, but when he fixed his eye on an object it appeared right. The same affection increased, might cause the appearances of which he spoke on this and on some other occasions.
But another witness testifies that Powers was intoxicated on the day that McTier says the bond was executed. It may have been so, but on comparing the testimony with that of others, it will be found that this witness came with Yan Horn, who bad an account to settle with Powers, and came in towards sun down. McTier says the papers were all drawn and executed before Yan Horn came in. This does not, consequently, contradict McTier’s statement as to the situation or capacity of Powers.
But we are not left to determine the veracity of McTier nor the capacity of Powers upon this evidence alone.
Lake, the defendant, in his answer, denies that the bond and deed, or either of them, were obtained by fraud and imposition,, *476 or threats of personal violence, or while Powers was in a state of intoxication. He admits they they were given without valuable consideration, but that Powers informed him that the consideration of the deed, and of a certain sealed bill or obligation ' he had given to Butler, was to make him equal to Francis Longwox’th, who had married another niece of Powers, and to whom he had advanced about two thousand dollars in cash; and that he had considered the situation of Butler’s family, and that it would be unjust for the two children he had by his second wife to stand back in the division of their father’s estate, and see the children of the first wife take the whole ; that he was well pleased with the conduct of Butler’s second wife, and with her treatment of the children, &c. He further states that he read over the deed to Powers, and informed him of the contents of it, when, in his judgment, he was fully competent to transact any business; that he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed; that he made his mark because he was unable to write his name without great difficulty; and that he did not acknowledge it before a proper officer because he was decrepit and lame, and could not well get into a wagon, but requested him and Stiers to witness it, and they did so.
Now th.s is stated upon the knowledge of the defendant, and is responsive to the bill, and must be taken as true, unless overcome by competent testimony. He not only gives his opinion of the capacity of Powers, but narrates conversations from which we can judge of it.
In corroboration of his statement, we have the certificate of the proof of the deed before Judge Johnson, by Lake, at a time when he had no connection with these parties.
Judge Johnson also states, that after the proof of the deed, and not long before Butler’s death, Powers sent for him and proposed to buy of him a piece of land adjoining the Lake farm, and said he had given that farm to Butlei’, and he wanted the lot to add to it and to have it conveyed to Butler. They *477 agreed upon the price of the land and for the conveyance, but the conveyance was neglected, and Butler soon after died, and it was never made.
He says Powers was sober, and he thought competent to do business, as much so then as when he usually saw him.
If this statement is correct, it shows, at least capacity enough to make a bargain, and continued good will towards Butler And while in this state of mind, he distinctly recognizes the conveyance of the Lake farm to Butler.
It appears very clearly that Powers had long been an intemperate man, and that after his removal to Butler’s his intemperance increased; that Butler and his wife were also in habits of beastly drunkenness, and when they all drank together, they generally quarrelled, and often had pitched battles, in which the old man usually fared the worst, and was sometimes very badly hurt.
When Butler was drunk, which seems to have been nearly every day, he used abusive and threatening language to the old man; and when the old man was drunk, he seems to have been terrified by it. But I cannot discover in any of the testimony, that Butler, when sober, used such language ; or that Powers, when not intoxicated, was ever put in fear by it; or that any violence, or any harsh words were used when both were sober; on the contrary, it appears that at such times they were very friendly, and that up to the time of executing the deed at least, Powers seems to have regarded Butler’s family with great interest, and even just before Butler’s death was willing to provide further for them, by adding to the farm already conveyed.
It appears to me, therefore, that the charge of fraud and violence, in procuring the bond and deed, is not sustained by the evidence.
It is clearly shown that the old man had a father’s care over Butler and hi3 family, from the time of their arrival in Philadelphia ; that he bore with his waywardness and abuse with nore than a father’s patience, and it is not surprising that entertaining such feelings, he should, upon being reconciled alter *478 •a quarrel, give him almost anything he asked. Such demands did not amount to extortion, nor such treatment to duress or •even intimidation.
It must be borne in mind also, that Powers, long before the •execution of the papers, had designed not only to provide for Butler, but largely to endow him, and accordingly we find that as early as the winter before Butler moved upon the Lake farm, Powers determined to give him a farm, and proposed to Charles Bartles, esquire, to sell one to Butler, and that he would pay for it, provided the price did not exceed three thousand •dollars; and at the time of this proposal, he stated in substance what the defendant says he stated to him, of his intentions and feelings toward the family. And I think it is fairly shown that he entertained these kind feelings and intentions up to the. time of executing the bond and deed.
After that, during their revels, in their quarrels, he denied the validity of the bond, and in his will he solemnly declared it void.
It is difficult to reconcile these declarations with his former acts. The increased brutality of the family, after the execution of those instruments, would naturally make him repent his kindness to them ; but if I have taken a proper view of the case, his repentance came too late ; his declarations, at any rate, cannot absolve the bond.
The evidence that Butler told Powers he need not pay the •bond unless he chose to do so, is too vague and indefinite to affect the case. And the alleged declaration of Lake to Smith and 'Wookon, “that there was a flaw in the bond, and there would be no difficulty about it,” even if there were no conflict of testimony, nor denial of it in the answer, ought not otherwise to affect it than to afford the executors some excuse for not being more fully prepared for trial.
Iiis saying there was a flaw in the bond, cannot vitiate or discharge it.
Again. It is charged that certain notes and books of account of Powers were purloined by Butler.
As to the books, there is no satisfactory evidence that any >Á *479 them ever came to Butler’s hands; the defendant says he never had or knew of any.
There were three notes which came to his possession. One against Murphy, taken at the vendue, and said to have been transferred to him, with other things, for twenty-five cents; one against Seal and Chamberlain, which, according to the testimony of David Chamberlain, Powers had given to him; and one against James Skinner, which Skinner and McTier say Powers also gave to Butler.
Without stopping to inquire into the validity of these gifts, or of the evidence of right from the fact of possession, I cannot •overlook the answer of the defendant upon this point, corroborated by the testimony of Margaret Labe, that the agents oí Powers agreed to make no charge of them, if he would make no charge against Powers for board.
Mr. Smith, one of these agents, does not recollect that agreement, but he does not pretend to have a distinct recollection of what took place then, and says that he was infirm at the time of giving his testimony. Without questioning his veracity, it may well be said, that Margaret Lake’s testimony on this point has the most weight.
I must, therefore, refuse to direct an account for the notes, or charges on the books, or for rents or moneys paid, as well because of the want of evidence of the existence of any proper claim therefor, as of a sufficient excuse for not pleading them as a set-off to the action on the bond.
In this view of the case, it is unnecessary to pursue the inquiry further, as it is obvious that this Is not a case in which the court should interfere.
The bill must therefore be dismissed, with costs.
Upon the allegation of the insolvency of the estate, I think the money paid into court should remain here until the dividend upon it shall be declared, and the amount of such dividend then paid to the defendants. But if any question shall arise upon that point, it can be settled, upon an application for an order foi the money.
Cited in Moore v. Gamble, 1 Stock, 248; Davis v. Headley, 7 C. E. Gr. 123. Holmes v. Steele, 1 Stew 176,